**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

| | |
|---|---|
| ESTATE OF KENNY RICHIE MARTY MITCHEL, ) | CIVIL ACTION NO. |
| **By and through Emily Rebecca Garlick and** ) | **3:19-CV-01914 (SRU)** |
| **Gerald Neville Mitchell,** ) | |
| **Its Personal Representatives** ) | **Jury Trial Demanded** |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GAVIN SCOTT HAPGOOD, a/k/a** ) | |
| **SCOTT HAPGOOD** ) | |
| **Defendants** ) | **February 6, 2020** |

---

### ANSWER, AFFIRMATIVE DEFENSES COUNTERCLAIMS

Defendant Gavin Scott Hapgood ("Scott" or "Defendant"), by and through his undersigned counsel, files this Answer, Affirmative Defenses, and Counterclaims against Plaintiff Estate of Kenny Richie Marty Mitchel by and through Emily Rebecca Garlick and Gerard Neville Mitchell ("Plaintiffs") as follows:

### I.    ANSWER

1.    Defendant generally denies the allegations of the Complaint and denies that Plaintiffs is entitled to any relief whatsoever.

### Parties, Jurisdiction, and Venue

2.    Answering paragraph 1 of the Complaint, Defendant admits that he is informed that Kenny Richie Marty Mitchel ("Mitchel") died on April 13, 2019. Defendant lacks sufficient information as to the truth of the remaining allegations contained in paragraph 1 and denies them on that basis.

3.    Answering paragraph 2 of the Complaint, Defendant lacks sufficient information as to the truth of the allegations and denies them on that basis.

4.      Answering paragraph 3 of the Complaint, Defendant admits that he is a resident of Darien, Connecticut.

5.      Answering paragraph 4 of the Complaint, Defendant admits that he is a citizen of the State of Connecticut. The remainder of paragraph 4 contains legal conclusions for which an answer is not required. To the extent an answer is required, Defendant lacks sufficient information as to the truth of the remaining allegations contained in paragraph 4 and denies them on that basis.

**First Count**
**(Intentional Battery)**

6.      Defendant admits the allegations in paragraph 5 of the Complaint.

7.      Defendant admits the allegations in paragraph 6 of the Complaint.

8.      Answering paragraph 7 of the Complaint, Defendant admits that he informed that Mitchel was employed at the Malliouhana as of April 13, 2019. Defendant lacks sufficient information as to the truth of the remaining allegations contained in paragraph 7 and denies them on that basis.

9.      Answering paragraph 8 of the Complaint, Defendant admits that on April 13, 2019 at around 3:30 p.m., Mitchel came to the room at the Malliouhana where the Hapgood family was staying. Defendant denies that he "admitted" Mitchel into his hotel room. In fact, Mitchel sought entry into the Hapgoods' room on the false pretense that the room had a broken sink. Defendant denies all remaining allegations in paragraph 8.

10.     Answering paragraph 9 of the Complaint, Defendant admits that he walked with Mitchel to a bathroom in one of the hotel rooms where he was staying. Defendant denies all remaining allegations in paragraph 9. A struggle did take place shortly thereafter, but only after Mitchel went to a different room and presented a knife threatening Defendant and Defendant's daughters H. Hapgood and R. Hapgood.

11.      Defendant denies the allegations of paragraph 10 of the Complaint.

12. Defendant denies the allegations of paragraph 11 of the Complaint.

13. Answering paragraph 12 of the Complaint, Defendant admits that he is informed that Mitchel died on April 13, 2019. Defendant denies the remaining allegations in paragraph 12 and states that Mitchel did not die as a result of anything Defendant did in the course of defending himself from Mitchel's attack. Rather, Mitchel died of a drug overdose.

14. Defendant denies the allegations of paragraph 13 of the Complaint.

15. Defendant denies the allegations of paragraph 14 of the Complaint.

16. Answering paragraphs 15 and 16 of the Complaint, Defendant states that these are legal contentions that do not require a response. To the extent a response is required, Defendant denies each and every allegation of paragraphs 15 and 16 of the Complaint.

## Second Count[1]
### (Negligence)

17. Answering paragraph 1 of the Second Count of the Complaint, Defendant realleges his responses to paragraphs 1-10 above and incorporates them by reference.

18. Defendant denies the allegations in paragraphs 11-14 of the Second Count of the Complaint.

19. Answering paragraphs 15 and 16 of the Second Count of the Complaint, Defendant states that these are legal contentions that do not require a response. To the extent they require a response, Defendant denies each and every allegation in paragraphs 15 and 16 of the Second Count of the Complaint.

---

[1] Defendant responds to the Plaintiff's allegations as Plaintiff numbered them—noting that the Complaint restarts the allegations under its Second Count with paragraph 1 followed by a paragraph 11.

## II.      AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Lack of Standing)

The Complaint fails because the Plaintiffs herein, namely the Estate of Kenny Richie Marty Mitchel by and through Emily Rebecca Garlick and Gerard Neville Mitchell, Its Personal Representatives lack standing and/or capacity to act on behalf of Mitchel and/or his estate and/or on behalf of the individuals for whom alleged damages are apparently sought.

### Second Affirmative Defense
### (Failure to State a Cause of Action)

The Complaint and each purported count contained therein fail to state facts sufficient to state a cause of action against Defendant.

### Third Affirmative Defense
### (Decedent's Own Conduct)

The alleged injuries or damages to Plaintiffs resulted from Mitchel's own conduct, not from any conduct of Defendant.

### Fourth Affirmative Defense
### (Superseding Cause)

The alleged injuries or damages to Mitchel or Plaintiffs resulted from conduct of others that occurred or had effect subsequent to the alleged wrongful conduct of Defendant.

### Fifth Affirmative Defense
### (Comparative Fault / Contributory Negligence)

Plaintiffs, Mitchel, and/or others, did not exercise ordinary care, caution, and prudence in connection with the transactions and events alleged within the Complaint, and Plaintiffs are therefore barred entirely from recovery against Defendant or, alternatively, Plaintiffs should have their recovery, if any, proportionately reduced.

## Sixth Affirmative Defense
### (Failure to Mitigate)

Plaintiffs have failed to mitigate or attempt to mitigate damages, if in fact any damages have been or will be sustained, and any recovery by Plaintiffs must be diminished or barred.

## Seventh Affirmative Defense
### (Set Off)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, Defendant is entitled to set off and offset and recoupment against any judgment that may be entered for Plaintiffs all obligations owing to Defendant.

## Eighth Affirmative Defense
### (Defense of Premises)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the alleged injuries or damages to Mitchel or Plaintiffs resulted from Defendant's defense of premises.

## Ninth Affirmative Defense
### (Defense of Others)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the alleged injuries or damages to Mitchel or Plaintiff resulted from Defendant's defense of others.

## Tenth Affirmative Defense
### (Self-Defense)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the alleged injuries or damages to Mitchel or Plaintiffs resulted from actions that Defendant undertook in self-defense.

### Eleventh Affirmative Defense
### (Wrongful Conduct)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the alleged injuries or damages to Mitchel or Plaintiffs resulted from Mitchel's own wrongful and criminal conduct.

### Twelfth Affirmative Defense
### (Assumption of Risk)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, Mitchel, by his conduct, assumed the risk of suffering the alleged injuries or damages.

### Thirteenth Affirmative Defense
### (Intervening Cause)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the damages that Plaintiffs allege were caused or made worse by conduct subsequent to the alleged wrongful conduct of Defendant.

### Fourteenth Affirmative Defense
### (Third-Party Comparative Fault / Contributory Negligence)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the alleged injuries or damages to Mitchel or Plaintiffs resulted from the comparative fault of contributory negligence of a third party or parties that bar Plaintiffs' claims in their entirety or require an apportionment of fault and proportional reduction in the damages claimed.

### Fifteenth Affirmative Defense
### (Justification / Necessity)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, Plaintiffs' claims are barred in whole or in part because Defendant's conduct was justified and necessary.

### Sixteenth Affirmative Defense
### (Reasonable Force)

Without conceding that any act of Defendant caused damage to Mitchel or Plaintiffs in any respect, the force, if any, used on Mitchel was reasonable under the circumstances and any alleged injury or damages allegedly suffered by Mitchel or Plaintiffs was due to and caused by reason of Mitchel's acts and conduct in the unlawful assault and battery committed by Mitchel and defense by Scott of himself and others, including his daughters.

### Seventeenth Affirmative Defense
### (Unclean Hands)

Plaintiffs' claims are barred by the doctrine of unclean hands.

### Eighteenth Affirmative Defense
### (Not Proper Representatives)

The Complaint fails because Emily Rebecca Garlick and/or Gerard Neville Mitchell did not properly become the lawful and proper representatives of, and are not lawful and proper representatives, of Mitchel and/or his estate.

### Nineteenth Affirmative Defense
### (Lack of Compliance with the Fatal Accidents Act)

The disclosure made in the Statement Pursuant to the Fatal Accidents Act, §6, does not comply with the requirements of the Fatal Accidents Act, Revised Statutes of Anguilla, Chapter F20.

### PRAYER FOR RELIEF ON THE ANSWER

**WHEREFORE**, Defendant prays for judgment as follows:

A.      That the Complaint and each of its counts be dismissed with prejudice;

B.      That Plaintiffs take nothing from Defendant by way of the Complaint;

C.      That Defendant be awarded all costs and reasonable attorneys' fees;

D.      For such other and further relief as this Court may deem just and proper.

### III.   **COUNTERCLAIMS**

Counter-Plaintiff Gavin Scott Hapgood ("Scott") hereby files the following counterclaims against the Estate of Kenny Richie Marty Mitchel by and through Emily Rebecca Garlick and Gerard Neville Mitchell ("Counter-Defendants") and in support of same alleges:

### **Introduction**

1.      Scott hoped for a dream vacation for himself and his family at the five-star Malliouhana resort owned by Auberge Resorts, LLC ("Auberge") on the tiny Caribbean island of Anguilla. Kenny Richie Marty Mitchel ("Mitchel") turned Scott's dream into a nightmare. A nightmare where Mitchel - fueled with cocaine, alcohol, and marijuana - attacked Scott at knifepoint. A nightmare where Mitchel viciously stabbed, clawed, bit, and beat Scott. A nightmare where Mitchel put Scott in fear for his life and his family. Scott's nightmare continues to this day and the full extent of the consequences of Mitchel's actions remain to be seen. To date, Scott's nightmare includes:getting charged with a frivolous criminal prosecution, getting thrown in jail without just cause, risking being killed because Mitchel's relatives worked there, and fighting against extradition. Scott's nightmare includes getting suspended from his job, enduring ongoing trauma and hardship, and being forced to defend this lawsuit brought by representatives of the man who stabbed, bit, and beat him.

2.      Mitchel destroyed the dream vacation that Scott had hoped for his family and himself to have with Mitchel's violent and malicious attack on Scott not long after it began. On April 13, 2019, Scott, his wife Kallie Hapgood ("Kallie), their two daughters R. Hapgood and H. Hapgood, and their son W. Hapgood had just arrived at the Malliouhana resort on the island of Anguilla for their first family vacation abroad. They spent the morning at the beach, and Scott had returned to their adjoining hotel rooms to watch television. R., then 13 years old, and H., then 11 years old, had just returned to

the hotel rooms as well. Kallie was returning snorkeling equipment. And W., then just 9 years old, was getting a cookie from the hotel lobby.

3. Someone knocked on the door. Scott came to the door and saw a man cloaked in the legitimacy of a hotel uniform whom Scott would later learn was Mitchel. Mitchel said he was there to fix a broken sink. This was a false pretense. There was no broken sink, and no one had called about one. But since Mitchel was wearing the uniform of the luxury resort, Scott allowed him into the room to check on the sink.

4. After pretending to inspect the so-called "broken" sink, Mitchel drew a knife, demanded money, and then physically attacked Scott. The attack was violent and prolonged. Mitchel, who toxicology reports demonstrate was high on cocaine and marijuana and drunk at the time, fought furiously, stabbing Scott and biting, clawing and hitting him. Scott endeavored to defend himself and to protect his daughters R. and H. as any father would do. Scott's daughters tried to pull the man away from their father and then ran to get help.

5. Despite Mitchel's attack, Scott eventually disarmed and restrained him. When hotel personnel arrived, Scott asked that they handcuff Mitchel to prevent further attacks. Instead, the hotel staff stood watching and waited to call the police or an ambulance. Unaware whether Mitchel had additional weapons, or whether hotel personnel, who appeared to be friendly with Mitchel, were in league with Mitchel as part of a coordinated robbery or attack, and fearful of continued violence, Scott continued to restrain Mitchel. Eventually, the hotel's security guard arrived and took over restraining Mitchel.

6. After ambulance personnel took Mitchel to the hospital, Mitchel, tragically, died there an hour later from an overdose of cocaine, according to the toxicology report prepared by the Anguillan authorities.

7.     Two weeks earlier, Mitchel had been arrested and charged with rape, and Mitchel had breached certain of his bail conditions and spent additional time in police custody.

8.     Thus, Mitchel—this drunk, high, delinquent, accused-rapist employee cloaked with the legitimacy of an Auberge uniform—gained access to the Hapgoods' room under false pretenses in order to rob, batter and assault Scott.

9.     The result of Mitchel's actions has been devastating for Scott and his family—physically, emotionally, and financially and the extent of the damage that Mitchel caused Scott remains to be seen.

10.     Anguilla is a small island with a population of roughly 15,000 - essentially a small town - so word traveled fast about the Mitchel's death.

11.     Shockingly, Anguillan prosecutors arrested and blamed Scott. They did so despite the facts that Mitchel had attacked Scott, had a history of criminal violence, and was under the influence of fatal amounts of cocaine at the time of the attack and despite the facts that Scott, by contrast, has no criminal record, was on vacation with his family, and was just watching TV in his hotel room after a day at the beach when Mitchel entered his family's hotel room. Anguillan prosecutors charged Scott with manslaughter, despite the obvious fact that Scott was acting in self-defense and in defense of his family.

12.     Scott was charged and sent to jail and later to prison. An angry mob gathered outside the jail. He was repeatedly yelled at and told he would be killed. Scott was terrified and so was his family, fearing they would never see him again. Because Mitchel's relatives worked *inside the prison,* Scott also feared that prison personnel would attack or kill him. Although Scott was initially denied bail by a magistrate, despite no objection being raised to bail by the prosecution, an Anguillan High

Court judge later allowed him to leave on bond because the judge feared that Scott would in fact be killed if he spent additional time in prison.

13.     Thereafter, desiring to clear his name despite the injustice of the charges and local authorities' issuance of a formal notice of death threats against Scott, Scott returned routinely, three times, to Anguilla for court hearings. Each time, Kallie and the children worried that Scott would be stuck in an Anguillan prison, or worse.

14.     When the Anguillan government's own toxicology results showed that Mitchel died from an overdose of cocaine, the prosecution nonetheless continued to press its charges against Scott. And, at the conclusion of the last hearing he attended, the Anguillan Prosecutor refused to guarantee that Scott could remain free on bail until any additional hearing and even threatened to charge him with murder, essentially forcing Scott to run the risk that he would be attacked or killed or thrown in a prison where his attacker's family members worked. It was a risk that Scott chose not to take so he did not return to Anguilla. Anguilla continues to pursue its charges against him.

15.     Though Scott is back with his family at their home in Connecticut, Scott's nightmare continues. Scott and his family worry that they will be attacked; they are frightened by everyday occurrences; and any time a family member leaves they worry that they won't come back. The entire family has sought trauma counseling. Because Scott remains charged with manslaughter, his employer put him on leave, depriving him of his career and depriving him and his family of his full income. Scott has also been unable to coach his son's football team. And the Hapgoods have received death threats.

16.     If all of this was not enough for Scott to endure, he must now defend this lawsuit brought by Mitchel's estate. Mitchel's death is tragic, but it is not a result of anything that Scott did.

## The Parties, Jurisdiction and Venue

17.     Counter-Plaintiff Gavin Scott Hapgood ("Scott") is an individual residing in Connecticut.

18.     Counter-Defendants are Emily Rebecca Garlick and Gerard Neville Mitchell who allege in the Complaint that they are the personal representatives of the Estate of Kenny Richie Marty Mitchel, by and through. In bringing their Complaint, they have alleged that the Probate Court of the Supreme Court of Anguilla appointed Emily Rebecca Garlick and Gerard Neville Mitchell representatives of the Estate of Richie Marty Mitchel on July 31, 2019.

19.     The Court has original jurisdiction over the Counterclaim pursuant to 28 U.S.C.A. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is diversity of amongst the parties.

## Factual Allegations

20.     Scott and Kallie booked a stay at Malliouhana through a travel agent. They reviewed the Auberge website and decided that the Malliouhana was the type of luxury resort that would be the perfect (and secure) place for a relaxing family vacation. It was the Hapgood family's first family vacation abroad. Scott and his family arrived at Malliouhana on April 12, 2019 at around 2 p.m. They stayed in a suite that combined Malliouhana Rooms 48 and 49.

## The Nightmare Begins as Scott is Attacked by Mitchel

21.     The attack came the next day - April 13, 2019. At the time of the attack, Kallie, R., and H. were still at the pool. Kallie was returning the snorkeling equipment. Scott and W. had returned to the room because Scott was having pain due to a herniated disc in his back and needed to rest. W. asked his father whether he could go to the lobby to get a cookie and Scott agreed. Scott stayed in the

family's rooms watching TV. R. and H. returned to the room. Just a few minutes after they arrived, and while they were still in their bathing suits, there was a knock on the door.

22.     Scott came to the door. He saw a man in an Auberge uniform, whom he later learned was Mitchel. Mitchel told Scott he had come to fix a broken sink in the room, but that was a lie. The Hapgoods had not called the hotel about a broken sink. Scott told Mitchel he didn't think there was a broken sink but that he could take a look. Scott went to the bathroom, then went to tell his daughters that someone was in the room and ask them if they knew about a broken sink.

23.     Scott then turned and saw Mitchel brandishing a utility "Leatherman" knife. Mitchel demanded that Scott give him his wallet and his money. Scott feared for his life and the lives of his daughters.

24.     A vicious struggle ensued. Mitchel stabbed Scott with the knife and bit him repeatedly. Mitchel, who was trained in Taekwondo and was much younger than Scott, fought very hard, in a crazed manner, clawing and growling. Mitchel's breath reeked, and Scott believed that he was under the influence of drugs and/or alcohol. The fight was long, sustained, violent and bloody.

25.     Seeing that their dad needed help, R. and H. at first tried to pull Mitchel off their father. But Scott then told them to get help and they ran to the resort's front desk, screaming and crying and asking for help.

26.     Scott was trying to neutralize Mitchel and keep him from continuing to attack Scott and cause him more injuries. Scott was able to knock the knife out of Mitchel's hands, and then pin Mitchel down. Eventually other hotel employees entered the room, having responded to the calls from the daughters after they reached the front desk. These hotel employees did not respond with any urgency or act particularly surprised at the event. They even referred to the attacker by his first name,

causing Scott to fear that these other hotel employees were in league with Mitchel as part of an orchestrated robbery. Scott told them that the attacker needed to be put into handcuffs.

27.     By this time, Kallie Hapgood arrived at the scene, and both Kallie and Scott urged the hotel staff to call the police and an ambulance and to put Mitchel in handcuffs. Inexplicably, the hotel staff did not want to call the police or an ambulance and delayed in doing so. Kallie did not know what to do, having been notified just minutes before by her terrified and tearful daughters (whom she came across in the hotel lobby) that their father was being attacked with a knife by a hotel employee. Indeed, Kallie did not know whether her husband was alive when she ran to the room.

28.     Eventually hotel security arrived. Scott transferred the restraint of Mitchel to the hotel's security guard, a portly gentleman. Scott told him, "You're a big guy, you take over." The hotel's security guard then restrained Mitchel until an ambulance arrived.

29.     Scott went to tend to his wounds. Kallie tried to assist him. She took pictures of his several stab wounds and teeth and fingernail marks. Scott had to be taken to a medical facility where he received further treatment.

30.     From the medical facility, Scott was escorted to the police station, allegedly to give a witness statement. It was there, as he was giving a witness statement, that Scott was told that Mitchel had passed away. Scott was shocked and saddened.

31.     After spending about an hour in medical custody, Mitchel died of a cocaine overdose as confirmed by the toxicology report and the Prosecution's medical examiner. In other words, nothing that Scott did in defending himself and his daughters against Mitchel's attack resulted in Mitchel's death.

### Mitchel Never Should Have Been at the Auberge, No Less in the Hapgood's Hotel Room

32.     In March 2019, less than three weeks before the attack, Mitchel was arrested and charged with a separate attack and rape. He then spent a night in jail and later breached one of the conditions of his bail. Under the conditions of bail, Mitchel was required to regularly go to the policy station to sign the logbook, which was only available at specified hours. By court order, Mitchel was also restricted from seeing his daughter and mother of his daughter. Mitchel's rape case was still pending at the time of the attack. He had breached one or more of the conditions of his bail, which resulted in spending additional time in police custody.

33.     Further, Mitchel, as a national of Dominica, was not eligible to work in Anguilla with a criminal charge pending. Yet Mitchel continued to work for the hotel and have access to its guests, including Scott and his children.

34.     Mitchel behaved erratically the day of the attack. He showed up to work two hours late and disappeared for a substantial period of time in the middle of the workday. He never returned to duty. Rather, he showed up to the Hapgoods' room, carrying a knife and acutely intoxicated with alcohol, marijuana and cocaine in violation of the law of Anguilla. His blood-alcohol content was more than twice the typical legal limit for drivers in the United States. Cocaine levels in his bloodstream were more than twice an amount known to be potentially fatal. Levels of cocabenzoid were also acute, indicating that he had consumed the cocaine shortly before his death.

35.     Mitchel died at the hospital from a cocaine overdose. Though the initial coroner's report, issued before the toxicology report, and without the benefit of any witness statements, pinned the blame on Scott, subsequent analysis proved that Mitchel died from "acute cocaine toxicity." Mitchel also had high levels of alcohol in his system.

## The Nightmare Escalates as Scott is Charged with Manslaughter

36.     Despite the abundant evidence that Mitchel was erratic, making it plain that he should at least be tested for drugs and alcohol, local authorities arrested Scott at the police station. First, they talked of charging him with murder, then decided on manslaughter. Scott was charged and arrested and spent the next three nights in jail, where he received constant death threats, including that he would have his head bashed in. By that stage, news of the attack spread through social media (where it was falsely asserted that Scott had attacked Mitchel), an angry mob gathered, forcing the Royal Anguillan Police Force and the Anguillan Premier to issue an appeal for public order.

37.     Scott was aware of all of these developments, and he was terrified, fearing for his life, and for his family. Kallie and the children also greatly feared for Scott and for themselves.

38.     Scott had no criminal record at the time of his arrest.

39.     A magistrate initially denied Scott bail, but that decision was later reversed by the judge who specifically remarked in his judgment that the prison was unsafe because relatives of the deceased's worked there, as well as other individuals from the deceased's home island of Dominica. These factors, the judge noted "weighed heavily on the court's decision, particularly in view of the court's observations concerning the public furor that this incident excited." With the help of the U.S. State Department, the Hapgoods returned home.

40.     Thereafter, desiring to clear his name despite the injustice of the charges and local authorities' issuance of a formal notice of death threats against Scott, Scott returned routinely, three times, to Anguilla for court hearings. Each time, Kallie and the children worried that Scott would be stuck in an Anguillan prison, or worse.

41.     When the Anguillan government's own toxicology results showed that cocaine killed Mitchel, the prosecution nonetheless continued to press its charges against Scott. And, at the conclusion of the last hearing he attended, the Anguillan Prosecutor refused to guarantee that Scott could remain free on bail until any additional hearing and even threatened to charge him with murder, essentially forcing Scott to run the risk that he would be attacked or killed or thrown in a prison where his attacker's family members worked.

42.     It was a risk that Scott chose not to take so he did not return to Anguilla, and Anguilla is now continuing to pursue its charges against him.

43.     Fighting these unfair criminal charges has forced Scott to incur costs for counsel, travel, and security.

**The Nightmare Continues Even After the Hapgoods Return Home**

44.     Because of the manslaughter charge, Scott's employer, UBS, put Scott on administrative leave. Scott works in a regulated industry and having a felony charge against him, even one that is demonstrably frivolous, disqualifies him from performing his job. Scott's career is driven entirely by client relationships, which he has not been able to cultivate for since the attack and which are severely impacted by these charges. Accordingly, Scott has lost income as a result of the attack. Scott has also had to spend much of his life savings as well.

45.     Even though Scott and his family have a strong network of family and friends who have been very supportive, Scott has nonetheless suffered social ostracism from those unaware of the true facts. For example, he was told he would not be allowed to coach his son's football team because of the charge pending in Anguilla. The children's classmates are keenly aware of the incident as well which has made it difficult for them to return to a normal life.

46.     The Hapgoods have also been targeted by individuals who have made death threats against them as a result of Mitchel's death, and those individuals have also wrongly viewed the attack on Scott and his acts in self-defense as having racial overtones.

47.     Scott and his entire family have had counseling for post-traumatic stress, which they have paid for. Everyday occurrences that would not have scared the plaintiffs prior to the attack, now cause them stress. Each trip Scott made back to Anguilla also caused incredible emotional stress as the plaintiffs were not sure if Scott would ever be allowed to return, or worse. The Anguillan authorities issued a formal notice stating that there were death threats against Scott, and the family feared that he would be harmed by locals or at the hands of the legal system.

48.     Scott also suffered physically as a result of the attack and had to pay for medical treatment. Scott suffered serious physical wounds, including several stab wounds, bite wounds to his nose, ear, and arm, claw marks on his arms, chest and face, and extensive bruising from being beaten. Scott also needed to undergo prophylactic treatment for communicable diseases because Mitchel had blood in his mouth when he repeatedly bit Scott during the attack.

49.     Scott also had to undergo HIV testing. For 6 months, Scott lived in fear that he might have acquired the virus from Mitchel, knowing that he took drugs and having heard from journalists that Mitchel had a reputation as a drug pusher.

50.     Despite the toxicology results showing that an overdose caused Mitchel's death, Anguilla has continued to prosecute Scott, and he has incurred substantial costs in defending that prosecution.

**First Cause of Action**
**(Negligence)**

51.     Plaintiff repeats and realleges all paragraphs above, as if fully set forth herein.

52.     Mitchel was negligent, reckless, and lacked diligence.

53.     As a result, Scott was harmed.

54.     The negligence, recklessness, and lack of diligence of Mitchel was a substantial factor in causing Scott's harm.

**Second Cause of Action**
**(Assault)**

55.     Scott repeats and realleges all paragraphs above, as if fully set forth herein.

56.     Mitchel brandished a knife and demanded money, intending to cause harmful or offensive contact with Scott.

57.     Scott reasonably believed that he was about to be touched in a harmful or offensive manner.

58.     Further, Mitchel threatened to touch Scott.

59.     It reasonably appeared to Scott that Mitchel was about to carry out the threat.

60.     Scott did not consent to Mitchel's conduct.

61.     Scott was harmed.

62.     Mitchel's conduct was a substantial factor in causing harm to Scott

63.     Scott was harmed, suffering serious stab, claw, and bite wounds and severe bruising. He also suffered severe emotional distress, thinking he and his young daughters might well be murdered.

### Third Cause of Action
**(Battery)**

64.     Scott repeats and realleges all paragraphs above, as if fully set forth herein.

65.     Mitchel stabbed, hit, clawed, and bit Scott repeatedly with the intent to harm him and without Scott's consent.

66.     Scott was harmed, suffering serious stab, claw, and bite wounds and severe bruising. He also suffered severe emotional distress, thinking he and his young daughters might well be murdered.

## **PRAYER FOR RELIEF ON THE COUNTERCLAIMS**

**WHEREFORE**, Counter-Plaintiff prays for judgment as follows:

A.      On the First, Second and Third Causes of Action, for general damages according to proof;

B.      On the First, Second and Third Causes of Action, for special damages according to proof;

C.      On the First, Second and Third Causes of Action, for punitive damages;

D.      For pre- and post-judgment interest;

E.      For cost of suit herein, including attorneys' fees, to the maximum extent allowed by law; and

F.      For such other and further relief as this Court may deem just and proper.


                                    **DEFENDANT,**
                                    **GAVIN SCOTT HAPGOOD A/K/A**
                                    **SCOTT HAPGOOD**

                        BY:    /s/ Michael C. Conroy, Esq.
                               Michael C. Conroy, Esq. (ct22254)
                               Hassett & George, P.C.
                               945 Hopmeadow Street
                               Simsbury, CT 06070
                               Telephone No.: (860) 651-1333
                               Facsimile No.: (860) 651-1888
                               Email: mconroy@hgesq.com

                                  -And-

                               Diamond McCarthy, LLP
                               Thomas Watson (admitted pro hac vice)
                               Robert W. Mockler (admitted pro hac vice)

## **DEMAND FOR TRIAL BY JURY**

NOTICE IS HEREBY GIVEN THAT Defendant and Counter-Plaintiff demands a trial by jury in the above-entitled matter.

 

 

                                    **DEFENDANT,**
**GAVIN SCOTT HAPGOOD A/K/A**
**SCOTT HAPGOOD**

BY:    /s/ Michael C. Conroy, Esq.
        Michael C. Conroy, Esq. (ct22254)
        Hassett & George, P.C.
        945 Hopmeadow Street
        Simsbury, CT 06070
        Telephone No.: (860) 651-1333
        Facsimile No.: (860) 651-1888
        Email: mconroy@hgesq.com

             -And-

        Diamond McCarthy, LLP
        Thomas Watson (admitted pro hac vice)
        Robert W. Mockler (admitted pro hac vice)

## **CERTIFICATION**

This is to certify that on this 6th of February, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing.  Parties may access this filing through the Court's electronic system.

/s/ Michael C. Conroy, Esq.
Michael C. Conroy